## L. O. BARNES v. THE STATE.

### No. 201.   Decided March 16, 1910.

### Rehearing Granted January 18, 1911.

**1.—Murder—Evidence—Declaration by Defendant.**

Where, upon trial of murder, the State's witness was stating the language as best he understood it as used by the defendant as he approached the deceased and before he fired the first shot, there was no error in admitting this testimony.

**2.—Same—Evidence—Opinion of Witness.**

Upon trial of murder, the witness could have stated the physical facts as to where the ball struck the door, but it was not proper for him to state his opinion as to position of the door from the bullet marks therein, nor the position of defendant's brother at the time.

**3.—Same—Evidence—Rebuttal—Argument of Counsel.**

Where, upon trial of murder, the State had shown by its witness that he had purchased a horse from one who was a State's witness and who in company with the defendant's brother went in a wagon to the station, where said State's witness took the train and left the State, leaving the inference that defendant had furnished the money for the purchase of said horse and induced said State's witness to leave the State for the purpose of not testifying in the case, it was reversible error not to permit defendant to show that the money for the purchase of said horse did not come from defendant or his brother but was given to witness by another party, and that the defendant and his brother were not instrumental in having said State's witness leave the State; especially where the State's counsel commented on this phase of the case.

**4.—Same—Charge of Court—Manslaughter—Adequate Cause.**

Where, upon trial of murder, the evidence showed that previous to the homicide there was an altercation between defendant and deceased, and that the latter had threatened defendant's life, all of which occurred a few hours before the homicide, a charge of the court which limited the adequate cause to the actions and words of the deceased at the time of the shooting and did not inform the jury that they should take into consideration all the facts and circumstances surrounding the case, was reversible error.

**5.—Same—Charge of Court—Standpoint of Defendant—Self-Defense.**

Where, upon trial of murder, the court's charge on self-defense properly submitted that the danger must be viewed from the standpoint alone of defendant, etc., there was no error.

**6.—Same—Charge of Court—Words and Phrases.**

Where, upon trial of murder, the court in his charge on self-defence properly read to the jury the words "expectation or fear," and qualified appellant's bill of exceptions, that the phrase "expectation of fear" was a change in the charge not made by the court or with his knowledge and consent, there was no reversible error.

**7.—Same—Charge of Court—Self-Defense—Apparent Danger—Threats—Serious**
     **Bodily Injury.**

Where, upon trial of murder, the evidence showed that the defendant had been threatened by deceased and acted on the appearance of danger, and the court's charge confined the jury to a consideration of actual danger, and did not apply the danger to serious bodily injury as well as to life there was reversible error.

**8.—Same—Separation of Jury.**

Where, upon trial of murder, it was not shown on defendant's complaint that the jury separated, that there was anything said to or by the juror who left the jury for a short time to catch his horse, etc., there was no reversible error.

**9.—Same—Swearing Witnesses—Practice.**

Where the motion for new trial, after conviction of murder, complained that two of the State's witnesses were not sworn, and that this fact was not discovered until after the trial, the complaint came too late. Following Goldsmith v. State, 32 Texas Crim. Rep., 112.

Appeal from the District Court of Grimes. Tried below before the Honorable S. W. Dean.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Buffington, Buffington & Bowen, and Carl T. Harper,* for appellant. —On the question that State's witnesses were not sworn: in the Goldsmith case, 32 Texas Crim. Rep., 112, we are left in doubt whether defendant discovered that the witness was not sworn during the trial or after; but if said case holds in fact that it is always too late to raise the question that the witnesses are not sworn, after trial, it is contrary to the weight of authority: Ogden v. State, 58 S. W. Rep., 1018; People v. McAdoo, 77 N. E. Rep., 260; Hawks v. Baker, 19 Am. Dec., 191; State v. Lugar, 88 N. W. Rep., 333; Rex v. Braser, 1 Leach, 237; State v. Michael, 19 L. R. A., 605; State v. Doherty, 2 Overt., 80; State v. Tom, 8 Or., 177; People v. Frindell, 58 Hun. 482; Slaughter v. Whitelock, 12 Ind., 338; Cady v. Norton, 14 Pick., 236; Taylor v. Taylor, 50 S. E. Rep., 274.

On the question of appearance of danger: Sims v. State, 9 Texas Crim. App., 586; Swain v. State, 48 Texas Crim. Rep., 98; 86 S. W. Rep,. 335; Sebastian v. State, 57 S. W. Rep., 820; Orman v. State, 24 Texas Crim. App., 495; Howard v. State, 23 Texas Crim. App., 265; Alexander v. State, 25 Texas Crim. App., 260; Thomas v. State, 56 S. W. Rep., 70; Huddleston v. State, 54 Texas Crim. Rep., 93.

On the question of the court's charge on manslaughter: Melton v. State, 47 Texas Crim. Rep., 451; 83 S. W. Rep., 823; Riley v. State, 81 S. W. Rep., 711; Lundy v. State, 48 Texas Crim. Rep., 217; 87 S. W. Rep., 352; Burnett v. State, 53 Texas Crim. Rep., 515, and cases last above cited.

*F. J. McCord,* Assistant Attorney-General, for the State.—(At the time this case was presented by brief of the State, Judge McCord was Assistant Attorney-General.)—On the question of the court's charge on manslaughter: McHenry v. State, 54 Texas Crim. Rep., 477; 114 S. W. Rep., 115.

On the question of not swearing State's witnesses: Cases cited in opinion.

DAVIDSON, Presiding Judge.—Appellant was allotted ten years in the penitentiary for murder in the second degree. About half

after one o'clock on the afternoon of October 17, 1908, in a little room attached to the barber shop and hiawatha joint of the deceased, Cecil M. Hall, there was a game of cards played in which the deceased and appellant participated; there were also others in the game. The deceased won the money of appellant on one of the hands played. Growing out of the loss of this money there grew an angry altercation. Appellant left the room and went across the street to his drug store and almost immediately returned. He, however, did not enter the place of business of the deceased but sat on the gallery, either of the deceased or adjoining gallery, the two business houses being joined by an unbroken gallery running in front of both. Appellant left his coat and pocketbook in the room where the card playing had occurred for which he sent a friend who secured and gave it to the appellant. Appellant afterwards returned to his drug store and remained there until about 4 o'clock. It is shown by some of the witnesses that the deceased threatened the life of appellant and armed himself for that purpose. These threats were communicated. These threats were to the effect that deceased intended to kill appellant before night. This is the concrete substance of the threats. It is in evidence that he, deceased, armed himself for this purpose. It is further shown in this connection that deceased had exchanged pistols with one of the officers some time prior to this trouble, the officer desiring the deceased's pistol because there was some defect in the pistol of the officer and it would not work satisfactorily. After the difficulty over the game of cards, the deceased got his pistol from the officer and made some remark to the effect that the officer's pistol wouldn't work well but his own pistol would and he was ready for the trouble with appellant. We are not undertaking to state the exact language but the concrete substance of the evidence in regard to this phase of the evidence. About 4 o'clock or a little after, the deceased entered the store of Lee Hall which was across the street from his place of business and immediately thereafter appellant and his brother entered the store behind the deceased. The deceased went to the back of the store and spoke to two of the witnesses who were sitting near the back door of the store. Afterward he went out of the back door to a little warehouse belonging to Lee Hall, which is estimated to be something like twenty feet from the main building and entered it. Lee Hall and Mooring were in there at the time and perhaps another party. Immediately after deceased went out the back door of the main building appellant went to this back door and leaned up against the side of it for two or three minutes looking in the direction of the door of the warehouse where the deceased entered. After remaining at this point two or three minutes, appellant hurriedly left it, going in the direction of where the deceased was, drawing his pistol and before reaching the warehouse fired as many as two shots, before getting on the little gallery of the warehouse. There is evidence indicating that the deceased fired one

shot, at least there was one empty shell in his pistol showing evidence of having recently been discharged. The brother of appellant, who accompanied and went out of the back door behind him, says' that he thought his brother was going home when he went out at the back door; that he was following along behind him and saw deceased standing in the door of the warehouse. He further states that he saw the hand of the deceased in his bosom, as he thought, to pull a pistol and called to his brother to look out. That his brother immediately fired two shots and he did not know who fired the third shot. Deceased's body was found some distance back from the door where he was seen standing, resting against a barrel on one side and some sacks of salt or flour, upon the other. He was shot in the back, left side and one ball entered through the fleshy part of the right arm and back of the bone. There was also one ball found imbedded in a barrel of syrup close to where the body of the deceased was found after the firing ceased. The testimony is very voluminous, a great deal of it of minor details, not necessary to be noticed and of no significance so far as this appeal is concerned. This is thought to be a sufficient statement to bring in review the questions suggested.

1. The first bill of exceptions recites that the State was permitted to prove by the witness McDonald, as follows: "I couldn't exactly understand the language the defendant used when he first shot at deceased, but I understood him to say something like, ' I have got you.' I can't say the exact language, but I understood it that way." The bill then recites as follows: "It having been material for the defendant to have the language said to be that of the defendant, and not guess work, in order that said witness might be contradicted by another witness for the State, George Miles, who heard deceased and not defendant make use of language of similar import. The importance being also in showing that defendant did not make the first attack, and the testimony should therefore have been exact." The objections were by the court overruled. There was no error in this ruling of the court if it be conceded that the bill shows any grounds of objection. The testimony was clearly admissible. The witness was stating the language as best he understood it as used by the appellant as he approached the deceased and before he fired the first shot. The court did not err in admitting this testimony.

2. Another bill recites that the defendant asked Robert Hall the following question: "What position, according to your judgment do you think that the door was in at the time the ball struck the door?" To which question the witness answered: "I can't give a definite answer on that. I can only judge from the range of the ball, and from the way it hit the door." This was excluded on objection by the State. It is further stated that it was proposed by the defendant to show by the testimony of this witness and he would have shown by him, that from the range of the ball and the way it hit the door, no witness, save Luther Barnes a witness for the defendant, could

have seen the deceased just before and at the time of the difficulty, or into the room where deceased then was. There was no error on the part of the court in this ruling. We are unable to ascertain the purpose for which this testimony was sought, unless it was for the purpose of showing the range of the ball by the way it hit the door. The bill is too meagre to ascertain what the purport of this testimony was or what would have been its bearing. The witness could have stated the physical facts as to where the ball struck the door and the direction it took and let the jury draw such conclusions as they deemed proper. It was not proper for the witness to state his opinion as to the position of the door from the bullet marks nor the position of appellant's brother at the time. By reference to the record the evidence in regard to the shot marks on the door was fully and elaborately brought out on the trial. In fact there was a great deal of testimony in regard to the marks on the door where one of the bullets is said to have taken effect. As this matter is presented, we could not intelligently review it without going over the whole record, which the court is not required to do and if we did, there was no error in the ruling of the court, for the matter was fully exemplified before the jury.

3. Appellant offered the witness Guerrant to show that he had given his son money with which to purchase a horse from Ross Stewart, a witness for the State. The State had shown by the witness Stewart that he had sold a horse to Joe Guerrant, the son of the witness, and had received the money therefore in the store of L. O. Barnes, the defendant, the defendant not being present, and the subsequent riding of said witness, Ross Stewart, to Mesa, with Luther Barnes, a brother of the defendant, and the said Joe Guerrant, and his departure from the State from that point. It is further recited as follows: "The State having attempted to show by the sale of said horse and the purchase thereof, that the brother of the defendant had attempted to have the witness Ross Stewart leave the State and not be at the trial of the defendant; and it being material for the defendant to show that neither he nor his brother had anything to do with the purchase of said horse." This bill is qualified as follows: "The testimony of the witness C. R. Guerrant was that he was not present when his son bought the horse, in question, and that he did not know of his own knowledge that his son purchased the horse with the money he had given him. That he only knew it from what his son had told him. The State objected to this testimony because it was hearsay, irrelevant and immaterial and on its face showed that there was better evidence. The witness Joe Guerrant was in attendance on the court and at the time had not been offered as a witness. All of which appears from the record." As qualified there was no error in rejecting this testimony. Ross Stewart was present and testified on the trial, and it was not questioned that the father gave the son money with which to buy the horse; that Ross Stewart

sold the horse to young Guerrant and went to Mississippi but returned to Grimes County, attended the trial and testified as a witness.

4. Another bill of exceptions recites that the district attorney urged that the brother of defendant, Luther Barnes, had procured the absence of Ross Stewart from the State to prevent him from testifying in this case. Objection was interposed to this line of argument because there was no testimony going to show that he Luther Barnes had in fact procured the absence of said witness, it having been shown by the State that said witness Ross Stewart had voluntarily returned to the State to testify, and this without being under process. The court qualifies this bill by stating that the remarks of the district attorney complained of were deductions from the evidence as shown by the testimony of the witness Ross Stewart in the record. We are of opinion this argument is not subject to criticism. By referring to the record it will be seen that the testimony of Ross Stewart and one or two other witnesses, shows that Ross Stewart sold the horse to young Guerrant and Guerrant and one of appellant's brothers carried him to the depot where he took the train for Mississippi. They say they took him there as an accommodation to the witness; that they were going by the depot to a lake on a fishing excursion; that young Guerrant who accompanied Ross Stewart to the depot was the man who purchased the horse, paying him $42.50, $27.50 in money and assuming a debt and mortgage of $15 on the horse.

4. There are several criticisms of the court's charge in regard to manslaughter which we think hypercritical. The charge on manslaughter was very full and favorable to appellant. There are also several criticisms of the court's charge with reference to self-defense. In a general way we would say that it is more than seriously to be questioned whether manslaughter or self-defense was in the case from the defendant's testimony, and clearly it was not from the evidence introduced by the State. However, the court gave a favorable charge on manslaughter, if it be conceded that it is in the case.

5. It is contended that the 24th section of the charge was deficient in not instructing the jury that the danger must be viewed from the standpoint of the defendant and from his standpoint alone at the time. That particular clause in section 24 of the charge is as follows: "Provided, he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint alone at the time, and in such case the party acting under such apprehension of danger, real or apparent, is in no event bound to retreat in order to avoid the necessity of killing his assailant,, and has the right to act as long as such danger appears to exist." This quotation answers the criticism set out in bill No. 11.

5½. Bill No. 12 criticises paragraph 25 of the charge wherein it uses the following expression in its charge on defendant's right of self-defense: "'Expectation of fear,' said expression having been

originally written 'expectation or fear,' but the 'r' having been
erased by the placing of an 'f' over it in pencil, the original 'or'
having been written on a typewriter." The exception being that
the expression "expectation of fear" is meaningless in law and the
court having nowhere charged on the expectation or fear of death or
serious bodily injury; and here now tenders this his bill of exceptions,
etc. The court qualifies this bill in the following language: "Atten-
tion is directed to the charge of the court and preceding and succeed-
ing paragraphs, where this error is fully covered, with a correct state-
ment "expectation or fear." I will state in this connection that the
charge was prepared by me "expectation or fear," and the change made
by some one without my knowledge or consent. It was read by me to
the jury as if written "expectation or fear." We think this objection
is hypercritical but if there were any merit in it, it was eliminated
by the statement of the trial court as above quoted.

6. Another bill recites that the court erred in paragraph 25 in
instructing the jury as follows: "Now, if from the evidence you believe
beyond a reasonable doubt, that the defendant killed the said Cecil
M. Hall, but you further believe that at the time of so doing the
deceased had made an attack on him," etc. The objection being that it
placed the burden of proving beyond a reasonable doubt, the existence of
the facts which would constitute self-defense; and limits the right of
self-defense to an attack already made, and does not give the right as
to an attack then being made, and in the act of being made, the evi-
dence showing that such an attack was in the act of being made, not
had been made. The court qualifies this bill by referring to the charge
of the court in regard to this matter. A reference to this section of
the charge in full, we think demonstrates there was no merit in it.
In order that we make it plain we copy the whole section: "Now,
if from the evidence you believe beyond a reasonable doubt, that
the defendant killed the said Cecil M. Hall, but you further believe,
that at the time of so doing the deceased had made an attack on
him, which from the manner of it, and all the facts and circumstances
surrounding the parties at the time, and the defendant's knowl-
edge of the character and disposition of the deceased, caused him
to have a reasonable expectation or fear of death or serious bodily
injury, and, that acting under such expectation of fear, the defendant
killed the deceased, then you should acquit him; and if the deceased
was armed at the time he was killed and was making such attack on
the defendant, and if the weapon used by him and the manner of
its use was such as were reasonably calculated to produce death or
serious bodily injury, then the law presumes that the deceased
intended to murder or aimed to inflict serious bodily injury on the
defendant. And if the deceased made demonstrations as if he were
armed, and as if he were about to draw a weapon, the defendant had
the same right to act as if the deceased had been armed." Taking this
latter clause without reference to the prior clause of the quoted charge

on self-defense, we are of opinion there could have been no possible injury done appellant. The court not only authorized the jury to acquit if the deceased had made an attack threatening life, or serious bodily injury, but in the latter part of the charge directly applied the charge to the very facts detailed by the brother of defendant, to wit: "If deceased made demonstrations as if he were armed, and as if he were about to draw a weapon, the defendant had the same right to act as if the deceased had been armed." We are of opinion that the charge as given sufficiently covers the facts of the case and pertinently directed the attention of the jury to the very facts of whatever danger could have presented itself to the mind of appellant as testified by his brother. As stated in the early part of the opinion, the brother of defendant said he noticed the deceased, as he stood in the door, had his hand in his bosom as if drawing or about to draw a weapon and called to his brother to look out, and that thereupon his brother fired twice. We think the charge, as before stated, was a direct application of the law to the facts.

7. Subdivision 28 of the charge is also criticised because it limits the law of threats to take the life of defendant by deceased. That charge in full is as follows: "You are further instructed in this connection that if you believe from the evidence that the deceased, Cecil M. Hall, had made threats to take the life of defendant or against his life, and at the time of the killing, if any, was doing or had done some act manifesting an intention to execute the threats so made, then you should acquit the defendant." Recurring to the testimony of the witness who testified in regard to threats, it will be noted that appellant emphasized, through the witnesses, that the deceased had threatened to shoot it out with defendant on the street and that he would do so before night. There was no other character of threats indicated except to take the life of appellant under this character of testimony. Usually the charge in regard to threats should include serious bodily injury as well as taking the life of the threatened party, but where the threats are directed exclusively to taking the life of the threatened party with a pistol or a gun, as in this case, we are of opinion that the omission in regard to serious bodily injury is not of such character as would require the court to reverse. The rule is that the charge must be directly applicable to the facts adduced before the jury and when the charge has pertinently applied the law to the given state of case, it is usually sufficient. If the deceased made the threats imputed to him, it was for the purpose of killing and therefore, under the circumstances, we are of opinion that this omission is not of sufficient importance in this case to require a reversal.

8. One of the grounds of the motion for new trial is that the jury separated after being empaneled. The facts show that the horse of one of the jurors had gotten out of the pasture, where he had placed it for safe keeping during the trial and was passing along the street

dragging a rope, that the juror left the jury and caught the horse a distance of twenty-five or thirty steps away and that an attorney in the case walked up and took the horse to take care of, or at least to relieve the juror of the trouble of the matter. There was nothing said by the juror to the attorney or the attorney to the juror, or by anybody to the juror in regard to the case. The above is the substance of the matter in regard to the separation. We are of opinion that this is not of sufficient importance to require a reversal.

9. Another ground of the motion for new trial is that two of the witnesses testifying in the case were not sworn and that this fact was not discovered until after the trail. This comes too late. This direct question was adjudicated in the case of Goldsmith v. State, 32 Texas Crim. Rep., 112. The language in the Goldsmith case is as follows: "It is made ground for a new trial, by amended motion, that the witness McConnell was not sworn before testifying. The agreed statement of the facts shows that he was introduced by, and testified for, the defendant. The amendment alleges that he 'testified for the State.' No objection was reserved at the trial, and it is too late to raise this question on motion for new trial, even if he testified for the State."

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*

McCord, Judge, disqualified.

### ON MOTION FOR REHEARING.

#### January 18, 1911.

DAVIDSON, PRESIDING JUDGE.—The judgment herein was affirmed. Appellant has filed a motion for rehearing based upon several propositions.

1. It is contended the charge on manslaughter is erroneous, and that this court was in error in holding that said charge sufficiently presented the law to the jury. Upon a review of the facts and the charge complained of we have reached the conclusion that we were in error. The 22nd subdivision of the charge, in a general way, defines manslaughter, but when the court came to apply the law to the facts in the 23rd subdivision of the charge it limited the adequate cause to the acts and words of deceased at the time of the killing. The 23rd subdivision of the charge reads as follows:

"Now, in this case, if you should find from the evidence, beyond a reasonable doubt that the defendant, L. O. Barnes, shot and thereby killed the said Cecil M. Hall, and at the time he did, the actions and words of the said deceased were of such a nature as to produce adequate cause and did produce such adequate cause, and did produce in his mind of the defendant, L. O. Barnes, sudden passion, such as anger," etc.

An inspection of the language quoted will show that the court

limited the adequate cause to the "actions and words of the deceased" at the time of the shooting. In the previous section of the charge the court had informed the jury that they should take into consideration all the facts and circumstances, but when applying the law to the facts he limited same to the action and words of the deceased at the very time of the shooting. This, under the authorities, is a restriction and limitation upon this phase of the law unwarranted by our statute, and we were in error holding the charge sufficient in the judgment of affirmance. The facts bearing upon this, without going into detail, substantially show that the parties had been, in the morning of the day of the homicide in the evening, engaged in some character of game in the "Hiawatha joint" of the deceased. High words and trouble ensued between deceased and appellant, and appellant left. Deceased threatened to take appellant's life which was subsequently communicated to appellant, some time prior to the homicide. Deceased had armed himself under the circumstances stated in the original opinion unnecessary here to repeat. In the evening just before the killing occurred, the parties were in the store of Lee Hall. Deceased went out the back door and into a store room, and was standing in the door when appellant, from his theory, was passing out the back door going home. The deceased made a remark to the effect, "Now, damn you, I have got you," and about that time placed his hand where his pistol was. It is shown that he did have a pistol and fired one shot. The testimony leaves it in doubt as to whether this remark was directed jocularly to Lee Hall, or intended for appellant. Appellant thought that it was intended for him. As appellant left the store, as he contends, going towards home, his brother holloed to him to look out, and upon looking up and taking in the situation, he jerked his pistol and fired. Under this state of case we are of opinion that we were wrong in the original opinion in sustaining this phase of the charge wherein the court limited manslaughter to the actions and words of the deceased at the time of the killing. The jury should have been instructed to view the case in the light of all the facts and circumstances. Reinhardt v. State, decided at the present term of the court; Ormon v. State, 24 Texas Crim. App., 495; Howard v. State, 23 Texas Crim. App., 265; Alexander v. State, 25 Texas Crim. App., 260; Thomas v. State, 56 S. W. Rep., 70; Swain v. State, 48 Texas Crim. Rep., 98; 86 S. W. Rep., 335; Neyland v. State, 13 Texas Crim. App., 536.

2. The charge in regard to threats is seriously attacked as being erroneous. The attack upon this charge is based upon the omission from it to instruct the jury that appellant would have the right to act upon the appearance of danger. Under the authorities this point seems to be well taken. Upon another trial the court in giving a charge upon threats will also charge in reference to apparent danger in conection therewith. Sims v. State, 9 Texas Crim. App., 586; Sebastian v. State, 57 S. W. Rep., 820; Swain v. State, 48 Texas

Crim. Rep., 98; 86 S. W. Rep., 335. There are quite a number of other authorities in line with these cited. We think that in so far as the original opinion is in conflict with the above views it is erroneous. The charge upon self-defense and upon threats upon another trial should apply the law applicable to serious bodily injury as well as danger to the life of appellant.

3. After a careful review of bills of exception Nos. 3 and 4, we have reached the conclusion we were wrong in holding there was no error shown on the face of them. Appellant offered proof by the witness C. R. Guerrant that the witness had given his son money with which to purchase the horse from Ross Stewart. It was shown by the witness Stewart that he had sold a horse to Joe Guerrant, son of C. R. Guerrant, and had received money therefor in the store of appellant, the appellant not being present. That subsequently Ross Stewart had ridden in a wagon to Mesa with a brother of appellant and Joe Guerrant, purchaser of the horse and there took the train and left the State. The State's purpose by this was to impress the jury that by the sale of the horse and the purchase thereof, that the brother of defendant had attempted to have the witness Ross Stewart leave the State and be absent from the trial of appellant. That, therefore, the evidence of C. R. Guerrant became material to show that neither appellant nor his brother had anything to do with the purchase of the horse. The State objected to this and it was excluded. The court qualifies the bill by showing that C. R. Guerrant was not present when his son bought the horse in question, and did not know of his own knowledge that his son did purchase the horse with the money he had given him; that he only knew it from what he said his son had told him. The State objected because it was hearsay, irrelevant and immaterial, etc., and because Joe Guerrant had not at that time been offered as a witness. We are of opinion that in as much as the State was trying to convey to the jury's mind that appellant had furnished the money to Guerrant to purchase Stewart's horse, and that his, appellant's brother, and Joe Guerrant, the purchaser of the horse, had carried Stewart to the train when he left the State; the appellant ought to have been permitted to show by the elder Guerrant that he in fact did let Joe Guerrant have the money. The reason for the introduction of this testimony is made stronger by reason of another bill of exception which shows that the district attorney urged before the jury that the brother of appellant had procured the absence of the witness, Ross Stewart, from the State to prevent his testimony from going before the jury. To this argument appellant urged objection because there was no testimony which showed that appellant's brother had in fact procured the absence of the witness, it having been shown also in the record that Ross Stewart had voluntarily returned to the State to testify and that appellant's brother had nothing to do with the purchase of the horse from Stewart by Joe Guerrant, therefore, there was no basis for this argument.

Objection to this argument was overruled by the court, and he states as a reason for doing so, that the remarks of the district attorney were but deductions from the evidence as shown by the testimony of the witness Ross Stewart in the record. While these bills are not as clear as they should be, still they were of sufficient importance and clearness to put the appellant in a damaging light before the jury through the fact that the horse had been paid for in his store, and his brother had carried the witness, Stewart, who sold the horse, to the train when he left Texas. Upon another trial if the case should develop as these bills show, the testimony of the elder Guerrant should be permitted to go to the jury. We will state, however, we do not see why the testimony of the acts of these parties, either Stewart, appellant's brother, or Joe Guerrant, should have been admitted in evidence in the absence of something connecting defendant with those matters. They seem to have been all done in his absence, and he is in no way connected with either the purchase of the horse, the payment of the money, or the departure of Stewart from the State. If appellant was instrumental in having a State witness leave the State, it would be a damaging fact against him before the jury. Therefore, we say upon another trial, before any of this testimony should be permitted to go to the jury, appellant must be in some manner connected with the acts of those parties.

Believing that we were in error in the former opinion in affirming the judgment, we grant the rehearing, set aside the affirmance, and now reverse the judgment and remand the cause.

*Reversed and remanded.*